IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| Kenlissia Jones, individually, and as | ) | |
| Next of Kin of Baby Boy Jones, and | ) | |
| As Temporary Administrator of the | ) | |
| Estate of Baby Boy Jones, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. _____ |
| | ) | |
| Phoebe Putney Memorial Hospital, Inc, | ) | Complaint |
| doing business at 417 W. 3rd Ave., | ) | Damages |
| Albany, GA., | ) | Jury Trial Request |
| | ) | |
| Dr. James Reed, | ) | |
| | ) | |
| Joanna Bell, nurse, | ) | |
| | ) | |
| Yolanda Fields, social worker, | ) | |
| | ) | |
| Michael J. Persley, Chief of the Albany | ) | |
| Police Department, individually and | ) | |
| in his official capacity under color of law, | ) | |
| | ) | |
| City of Albany, GA, | ) | |
| | ) | |
| Chanita Salyer, individually under color | ) | |
| of law as an Albany Police officer, | ) | |
| | ) | |
| Lakesha Bryant, individually under color | ) | |
| of law as an Albany Police officer, | ) | |
| | ) | |
| John and/or Jane Doe Albany Police | ) | |
| Department supervisors, whose | ) | |
| names and number are not known, are | ) | |
| sued under color of law, individually and | ) | |
| and in their official capacities as supervisors | ) | |

1

|  | ) |
| Jane Doe White Nurse, individually | ) |
| under color of law, | ) |
|  | ) |
| Individually and joint, and for conspiracy | ) |
| with one another, | ) |
|  | ) |
| Defendants. | ) |

## COMPLAINT

COMES NOW, Plaintiff, Kenlissia Jones, who shows the Court the following:

## Jurisdiction and Venue

1.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action asserts a deprivation of one or more federal constitutional rights through 42 U.S.C. § 1983 and 42 U.S.C. § 1395, et seq. (EMTALA).

2.      The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that any "person who, under color of [law] … subjects, or causes to be subjected, any [person] … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured…" for the injuries caused.

3.     This Complaint also asserts supplemental state claims under 28 U.S.C. § 1367.

4.     Venue is proper within the Albany Division because the challenged incident occurred in Albany, Georgia.

Parties

1.      Plaintiff Kenlissia Jones, brings this action individually on behalf of herself for claims under EMTALA, medical malpractice, deprivation of federal rights under 42 U.S.C. § 1983, and state claims of wrongful detention and malicious prosecution. Ms. Jones is an adult competent to bring this action and she also is the natural mother and next of kin of the decedent Baby Boy Jones, who also at material times was being carried in utero by Plaintiff Kenlissia Jones.

2.     Plaintiff Kenlissia Jones, brings this action as next of kin for any wrongful death action under state law of Baby Boy Jones, and also as a next of kin for any remedies applicable under EMTALA and 42 U.S.C. § 1983 where the next of kin are the lawful plaintiffs.

3.     Plaintiff Kenlissia Jones, brings this action as a temporary administrator of the estate of Baby Boy Jones, for remedies under EMTALA and 42 U.S.C. § 1983 where the estate is the lawful plaintiff.

4.     Phoebe Putney Memorial Hospital, Inc, ("Def. Hospital" or "Phoebe Putney") is sued as a corporation registered in Georgia and doing business at 417 W. 3rd Ave., Albany, GA, as a hospital.  The registered agent for purposes of service, according to the Georgia Secretary of State website on June 5, 2017, is

Dawn G. Benson, whose physical address is 417 W. 3rd Ave., Albany, GA.  Def.

Hospital is sued for violation of EMTALA, deprivation of federal rights under 42

U.S.C. § 1983, medical malpractice, and state torts of wrongful detention and

malicious prosecution. Defendant Hospital is sued for the actions and refusals to

act of its agents, for which it is vicariously liable.  Defendant Hospital is sued

individually and jointly, and for actions taken in conspiracy with one or more

defendant officers individually and/or in their individual and official capacity.

5.      Defendant James Reed, (Def. Dr. Reed) is a physician who worked as an

employee of, or contractor for, Def. Hospital. Def. Reed is sued for medical

malpractice as to all Plaintiffs, conspiracy with one or more officers acting under

color of law causing the deprivation of one or more federal rights of Plaintiff Jones

in her individual capacity, and for causing the state torts of wrongful detention and

malicious prosecution to Ms. Jones. Def. Reed is sued individually and jointly, and

for actions taken in conspiracy with one or more defendant officers individually

and/or in their official capacity.

6.      Defendant Joanna Bell, (Def. Nurse Bell) is a nurse, who worked as an

employee of Def. Hospital. Def. Bell is sued for medical malpractice as to all

Plaintiffs, conspiracy with one or more officers acting under color of law causing

the deprivation of one or more federal rights of Plaintiff Jones in her individual

capacity, and the state torts of wrongful detention and malicious prosecution. Def.

Bell is sued individually and jointly, and for actions taken in conspiracy with one or more defendant officers individually and/or in their official capacity.

7.     Defendant Yolanda Fields (Def. Soc. Worker Fields) is a social worker who worked as an employee of or for Def. Hospital. Def. Soc. Worker Fields is sued for conspiracy with one or more officers acting under color of law causing the deprivation of one or more federal rights of Plaintiff Jones in her individual capacity, and state torts of wrongful detention and malicious prosecution. Def. Fields is sued individually and jointly, and for actions taken in conspiracy with one or more defendant officers individually and/or in their official capacity.

8.     Defendant Chief Persley, is sued individually and in his official capacity as the Chief of Police of the City of Albany Georgia, and in his supervisory capacity for causing one or deprivations of federal rights of Plaintiff Jones under color of law.  He is sued for causing state torts of wrongful detention and malicious prosecution.  Def. Persley is sued individually and jointly, and for actions taken in conspiracy with one or more defendant officers individually and/or in their official capacity, and Defendants Phoebe Hospital, Dr. Reed, Nurse Bell of Soc. Worker Fields.

9.     To the extent that Defendant Chief Persley causes a deprivation of rights in his official capacity as a policy maker in his official capacity, or through a policy,

practice or custom, then the City of Albany is liable, and therefore the City of Albany is sued.

10.    Defendant Chanita Salyer, is sued individually and for the possibility of being a supervisor for causing one or deprivations of federal rights of Plaintiff Jones under color of law, and for being a joint or proximate cause of the arrest and/or malicious prosecution of Plaintiff Jones individually. She is sued for the state torts of wrongful detention and malicious prosecution.  She is sued individually and jointly, and for actions taken in conspiracy with one or more defendant officers individually and/or in their official capacity, and Defendants Phoebe Hospital, Dr. Reed, Nurse Bell of Soc. Worker Fields.

11.    Defendant Lakesha Bryant, is sued individually and for the possibility of being a supervisor for causing one or deprivations of federal rights of Plaintiff Jones under color of law, and for being a joint or proximate cause of the arrest and/or malicious prosecution of Plaintiff Jones individually. Def. Bryant is sued for the state torts of wrongful detention and malicious prosecution.  Def. Bryant is sued individually and jointly, and for actions taken in conspiracy with one or more defendant officers individually and/or in their official capacity, and Defendants Phoebe Hospital, Dr. Reed, Nurse Bell of Soc. Worker Fields.

12.    Defendants John and/or Jane Doe City of Albany Police Department supervisor(s) are sued individually and for the possibility of being a supervisor for

causing one or deprivations of federal rights of Plaintiff Jones under color of law,

and for being a joint or proximate cause of the arrest and/or malicious prosecution,

and for unreasonably drawing blood, of Plaintiff Jones individually. Defendants

John and/or Jane Doe supervisor(s) are sued for the state torts of wrongful

detention and malicious prosecution.  Defendants John and/or Jane Doe

supervisor(s) are sued individually and jointly, and for actions taken in conspiracy

with one or more defendant officers individually and/or in their official capacity,

and Defendants Phoebe Hospital, Dr. Reed, Nurse Bell of Soc. Worker Fields.  The

true names and number of the supervisors is known by the Chief or other persons

under the control of the Defendants, and Defendants have an affirmative duty to

notify the court of said persons, without whom full relief and a decision on the

merits cannot be reached.

13.    Defendant Jane Doe White Nurse is sued individually for causing one or

deprivations of federal rights of Plaintiff Jones under color of law, and for being a

joint or proximate cause of the unlawful seizure of Plaintiff's blood.

14.    All Defendants are sued individually and jointly, and for acting in

conspiracy with one another.

15.    Unnamed as a party is Shyler Brown, who is the natural father of the

decedent Baby Boy Jones.  Plaintiff's counsel does not represent Mr. Brown,

because his interests may differ, or be contrary to that of the Plaintiff Ms. Jones.

Plaintiff's counsel does not know his location, but will try to ascertain the same and send him a copy of this lawsuit by certified mail.  If joined he would be a Plaintiff.

Facts

16.    Because she missed her period in February 2016, Plaintiff Kenlissia Jones believed that she had become pregnant in about the middle of January.

17.    In the late winter and spring of 2016, Ms. Jones, a mother of two minor children was applying for work but was not getting hired, and was under stress to provide for herself and children.

18.    The continuing dire financial situation weighed heavily on Plaintiff which caused her to be depressed.

19.    On May 23, 2015, Ms. Jones was arrested by a male officer for driving on a suspended license, after he stopped her for failure to dim her headlights as his car approached.

20.    An arraignment date for the traffic charges was set for July 24th, 2015, in Dougherty County State Court.

21.    Plaintiff knew that she would need money for fines and fees and would need a job to improve her chances of probation, therefore it became even more important for her to get a job.

22.    Ms. Jones kept trying to get work, but kept being turned down.

23.     By at least late April, it was apparent that Plaintiff was pregnant, and Ms. Jones believed she was being turned down in part because she was pregnant.

24.     Ms. Jones considered her serious situation and sought solutions.

25.     Plaintiff Jones learned from searching the internet, news stories and discussions with others that infants born prematurely, even those carried only a few months, when treated at good hospitals, had been kept alive.

26.     Plaintiff believed that a fetus delivered after being carried five and one-half months had a reasonable chance of survival at a good hospital.

27.     Plaintiff was aware of deliveries at 23 weeks and the children had thrived.

28.     There had been stories in the local news about Phoebe Putney having saved babies that were prematurely born.

29.     Phoebe Putney had propagated advertisements about being a hospital that had the capacity to save babies born prematurely, who weighed only a pound.

30.     Plaintiff formed the reasonable belief that even if the baby were born at 5 ½ or 6 months, that if given proper medical care, the child had it reasonable chance to survive and thrive.

31.     Plaintiff searched the internet about medications to induce labor.

32.     Plaintiff found a business on the internet that sold medication that caused labor so she purchased some.

33.     Plaintiff had followed up with medical advice and the plan to enroll in the labor and did delivery program at Phoebe Putney for persons over twenty weeks gestation, which is the reason she did not need to stop at the emergency room which came to the hospital on each of the two times on the night in question.

34.     Her plan was to take the medication and go to the hospital and get medical help for baby and self before delivery, so that when the baby was born it would be born in the hospital with ready access to emergency and NICU care.  Plaintiff was intending to quicken her pregnancy and to quicken her unborn child's path to life.

35.     No print on the medication she received warned her that if she went to a hospital, and told them that had taken the medication, that the hospital might conclude that she only sought to abort the baby and would not render any treatment to save the baby.

36.     Plaintiff ordered the pills and they were delivered by mail to her house.

37.     At about 11:30 PM, June 5, 2015, she took four or five pills of Misoprostol, also known as Cytotec.

38.     At about 2:00 am in the morning of June 6, 2015, she was in a great deal of pain and felt like she would deliver, so she arranged a ride to the Phoebe Putney hospital, and was driven by Patricia Williams.  Plaintiff wanted to get to the Hospital in time for the hospital to care for her and her unborn child to prepare for

delivery and to provide all the available NICU and emergency medical care that her baby would need upon delivery.

39.     Plaintiff was at the Phoebe Putney Memorial Hospital on 06.06.15 from 2:35 am, until 3:50 am when she was abandoned and discharged home without required examination and treatment to stabilize her condition and the condition of her unborn child and to care for the child upon delivery.

40.     When she arrived at the hospital, she went in to the ER, registered, informed them that she was on Medicaid, briefly told them her symptoms, and that she was at least five and one-half months pregnant.

41.     So pursuant to policy of the Defendant hospital she was sent to the Labor and Delivery section, as an extension of the emergency department.

42.     Plaintiff informed a nurse that she had come to the hospital because of severe pain, that she was five or six months pregnant and that her chief complaint was that she had not felt the baby move since eleven pm.  Plaintiff also indicated that if the baby was a boy she would want it circumcised.

43.     A nurse put a heart monitor on the baby, which registered the heart beat and other critical information indicating that the baby was possibly viable.

44.     The nurse recorded the baby as being at least 23 weeks of gestation.

45.     Under O.C.G.A. § 16-12-141 (c)(2) "If the child is capable of sustained life, medical aid then available must be rendered." This provision applies to medical

providers who are presented with unborn children who are at more than 20 weeks. Therefore, Defendants Phoebe Putney, Defendant Nurse Bell, and Defendant Doctor Reed were required to make decisions and take actions to provide medical aid to baby boy Jones by not discharging Kenlissia Jones even though she was not dilated or showing other Indica of active labor, even though she had some contractions.  Defendants Phoebe Putney, Nurse Bell, and Dr. Reed knew and should have known that they were required to provide available and required medical attention to help Plaintiff's unborn child live and to ensure its health during and after delivery.

46.     This law also applied when Plaintiff returned to Phoebe Putney after delivery, and Phoebe Putney and its agents did not provide medical care to Baby Boy Jones.

47.     Plaintiff was having contractions, although not back to back, and was pregnant, and therefore was protected by EMTALA.

48.     Because the fetus was likely to deliver in the near future, at a time that, could not be predicted with precision because of a failure to follow the standard of care of testing and observation, so that Plaintiff could be warned when to return, so that the delivery occurred within the hospital, because of the misoprostol taken by the mother, the conditions posed a threat to the health or safety of the baby and the

mother by sending them home, without full and documented approval by a physician.

49.     Upon information and belief, a doctor did not give the discharge order, nor exercise medical judgment on whether to discharge Plaintiff at the first visit to the ER and L&D.

50.     One of the alleged reasons that a doctor did not participate in an evaluation of the Plaintiff on her first visit to the hospital was confusion or misapplication about policy of who was responsible to examine the patient.

51.     Dr. James Reed made the statement that a Dr. James Small should have been contacted by the nurses about the Plaintiff and infant, and not him. Upon information and belief Dr. Reed made this statement to cover up his refusal to treat Plaintiff.

52.     One of the plausible reasons that Dr. James Reed had not examined the patient before the discharge order was signed and put into effect by nurse Bell is that Reed jumped to the conclusion, was that he believed that Plaintiff was involved in a criminal act with the taking of the misoprostol, notwithstanding and in spite of his duty under the law to act to protect the health and safety of the possibly viable Baby boy Jones.

53.     Even though there was information that Plaintiff had taken a large amount of misoprostol, no physician examined Plaintiff nor approved the discharge.

54.     On June 6, 2015, at approximately 3:40 am, Nurse Bell contacted Dr. Reed and conveyed to Dr. Reed that Plaintiff was 23 plus weeks pregnant and had taken either an unknown amount of misoprostol and in the alternative, upon information and belief, a large amount of misoprostol.

55.     On June 6, 2015, at approximately 3:43am, Nurse Bell represented on Plaintiff's discharge order that she received an order from Dr. Reed that Plaintiff should be discharged home (with no further instructions for caring for the baby nor seeking medical aid at a later point in time).

56.     One or more days later, apparently on July 7, 2015 at 10:09 Dr. Reed wrote on the bottom of the discharge order that: "I did not give this order," and signed his name. JPB 187.

57.     On June 10 and or June 16, Dr. Reed represented in a written statement that, after receiving the information about Plaintiff from Nurse Bell, he told her that "I would not participate in criminal activity" and upon information and belief conveyed to Nurse Bell that he was discharging and abandoning Plaintiff due to her alleged criminal activity. JPB 186.

58.     In the alternative that Dr. Reed told Nurse Bell to call the on-call doctor for unassigned patients for further guidance, Nurse Bell did not call any other Doctor for instructions about Plaintiff.  In the alternative that Nurse Bell was told this by

Dr. Reed, Nurse Bell did not contact another Doctor because Nurse Bell did not want to be involved in what she believed to be criminal activity.

59.    Upon information and belief, the concern by Nurse Bell and Dr. Reed about the alleged "criminal activity" of Plaintiff was an expression of religiously and racially motivated bias against Plaintiff and similarly situated persons, clouding their thinking about their medical and legal duties.

60.    In light of the totality of the circumstances, and information that Plaintiff had taken a large amount of misoprostol, given the foreseeable consequences of serious injury to fetus and/or mother, of a delivery away from access to immediate emergency care, it was reckless and deliberately indifferent for the nurses and other agents of the hospital to send Plaintiff back home at about 4:00 am on June 6, 2015.

61.    The nurse told Plaintiff that even though Plaintiff was having contractions, they were not frequent nor consistent enough, that she was not dilated enough, and that her water not broken, so they would not keep her for continued observation, because she apparently did not meet L & D guidelines, notwithstanding there was an independent emergency condition caused by the presence of a large amount of misoprostol and viability and age of the fetus, and so they would be discharging her.  The nurse told Plaintiff that most people do this at home and that if the baby dies you should bring the remains into the hospital to keep yourself out of trouble.

Nurse Bell and Doctor Reed did not inform Plaintiff that the reason given by Dr. Reed for causing her discharge was that he believed that she was engaged in a criminal abortion.

62.     The standard of care for similar circumstances that is ordinarily employed by the medical profession generally, was to retain Plaintiff and the baby, and observe them until the impending delivery, and then provide all available and required medical attention to keep the baby alive.

63.     Defendant Phoebe Putney put forward the public image that they had available medical care to save premature babies, and they implied that they had a successful track record of saving premature babies who weighed only a pound. When Baby Boy Jones was delivered, he was alive at first and weighed one pound and 2.4 ounces.

64.     Instead, and with conscious indifference to the rights of all and to the risk imposed to mother and fetus, of serious injury if delivery did not occur within the hospital, the acts and refusals to act of Dr. Reed, Nurse Bell and one or more agents of Defendant Putney Hospital resulted in abandoning Plaintiff.

65.     Discharging Plaintiff caused her to deliver outside of the hospital, causing unnecessary physical injury, pain and suffering, mental anguish, and risk of serious negative health effects to Plaintiff Kenlissia Jones.

66.     Defendant Nurse Bell and Dr. Reed knew and should have known as a matter of the ordinary standard of care for similar conditions and circumstances employed by the medical profession generally that the large amount of misoprostol taken by Plaintiff would quickly induce labor in Plaintiff requiring immediate NICU and emergency medical attention for Baby Boy Jones and unnecessary physical pain and suffering and risk to health of Kenlissia Jones herself.

67.     Discharging Plaintiff and Baby Jones caused him to be delivered in a car, on the way to the hospital, causing him unnecessary physical injury, pain and suffering pain suffering, and mental anguish, and placing his viability in serious risk, by the time he did arrive at the hospital.

68.     The nurse treated her like a pregnant woman at 23 weeks who had not taken any labor inducing drugs, and like a pregnant woman during the first trimester who had taken labor inducing drugs, and told her she could come home when her water had broken.

69.     The fact that Plaintiff had taken the misoprostol been communicated to and understood by R Dr. James Reed, but he refused to care for Plaintiff, passing medical judgment on what care the Plaintiff sought for herself and baby, and imposed a manner of care upon her, by his will failure to act consistent with acceptable standard of care, and his willing refusal to treat her baby assuming he knew her alleged criminal intentions based on the name of the drug she had taken.

70.    Dr. Reed and other agents of Phoebe Putney imposed their own will about the type of treatment Plaintiff sought, thereby undermining Plaintiff's control of the treatment she sought, and undermining her consent to the type of treatment she received, presuming Plaintiff, who is Black, poor and on Medicaid, that her sole motive all she wanted to do was abort the fetus, take action to cause it to die, and they gave no consideration to her fundamental rights, nor those of the baby, notwithstanding the license and quid pro quo with the State and people, to provide care sought, without regard to insurance status, race, or actions of the patient prior to the request for care.

71.    This usurping of Plaintiff's control of her physical condition and that of her child undermined her fundamental right to seek the care she desired as to her body and that of her child, protected as a fundamental right under the liberty interests falling under the First and Fourteenth Amendment rights of Plaintiff Kenlissia Jones as a parent, and of unborn child who became Baby Boy Jones, and of her right to familial association; and her right to be free from unreasonable searches and seizures under the Fourth Amendment consistent with the presumption of innocence and the right to dictate familial relationships including quickening an unborn child's path to life.

72.    Upon information and belief, Dr. Reed refused to care for Plaintiff because, in deviation of the standard of care, he believed Plaintiff was involved of a

criminal act, instead of trying to provide for the early delivery of her baby and quicken her unborn child's path to life.

73.     When the baby arrived back at the hospital, it was in need of immediate medical attention, where the failure to provide would cause health in serious jeopardy or serious damage to bodily function.

74.     If the Defendant Putney Hospital agents had not sent Plaintiff home, in deliberate indifference to and reckless disregard of the information that she had taken misoprostol, then the delivery would have occurred in the hospital and baby boy Jones would have been able to receive immediate care, instead of delivering in a car.

75.     Because of the amount of the misoprostol the mother had taken, even if the mother had not been pregnant, she and the baby were in serious medical jeopardy when discharged in the early morning of June 6, 2015.

76.     During this first visit to Defendant Phoebe Putney, Plaintiff was asked whether she wanted the child circumcised if it were a boy, she answered yes, showing she was there for treatment of herself and the child.

77.     After about forty minutes, a heavy set, white nurse began the treatment and to talk to Plaintiff.

78.     Plaintiff told the White Phoebe Putney nurse that she had taken four or five pills of misoprostol.

79.     The nurse knew and should have known that misoprostol in a much lesser amount could soon cause delivery.

80.     The nurse knew and should have known that misoprostol, given the amount, would cause serious pain and suffering to Plaintiff and could cause her serious injury.

81.     She also warned them of the pain and other symptoms she was feeling, which tended to show that she was nearing delivery.

82.     Although she was in a condition such that she should have been admitted and observed for 24 to 48 hours, agents of Phoebe County Hospital including possibly Dr. Small, caused her to be sent home.

83.     She was sent home by agents of Phoebe Putney hospital without adequate diagnosis and treatment of her current condition by a physician.

84.     Plaintiff went home and stayed, as directed.

85.     Finally the pain was so severe that she asked Ms. Williams drive her back to Phoebe Putney.  Plaintiff is on extreme pain on the way to the hospital and delivers in the car. When she arrives at the hospital at about 2:25 pm, the baby is in the amniotic sack, alive.  A nurse comes out and plaintiff is placed in a chair or gurney to be taken to Labor and Delivery.  A nurse picks up baby boy jones who is still in the amniotic sack and enters the hospital.  After mother and baby are both inside the baby is removed from the amniotic sack and is alive and viable.  Agents of

Defendant Phoebe Hospital do not immediately take the baby to the NICU and the baby remains near plaintiff.  Plaintiff is asked if she wants to save the baby, and Plaintiff says yes.  After about five minutes a nurse from the NICU comes to plaintiff says that the tubes would tear the baby and the treatment would be a waste and of little use.  They wrap baby boy jones in a cloth and give him to plaintiff Jones and he expires shortly thereafter.

86.    General medical care is rendered to the plaintiff.

87.    Upon information and belief agents for the Hospital, in violation of HIPPA and other state privacy laws, relayed information to a Phoebe social worker, Defendant Yolanda Fields, and or other agents of Phoebe Hospital, about Plaintiff.

88.    Upon information and belief Defendant Yolanda Fields and other agents of Phoebe Hospital conveyed private information protected under HIPPA and Georgia laws to employees of the City of Albany Police, including Chanita Salyer, Lakesha Bryant, and the one or more other police officers, with whom they were acting jointly and in conspiracy to press charges of malice murder. Upon information and belief, the private information relayed is as follows: that personnel at Defendant Phoebe Hospital believed that Plaintiff had attempted an abortion after the first trimester and that the baby had died.

89.    Upon information and belief Yolanda Fields and other agents of Defendant Phoebe Hospital concealed and did not relay to the police the following

21

information: Plaintiff had been to the hospital earlier that day and had

communicated to medical personnel that she wanted to keep the baby, and that she

been discharged under circumstances showing that the Hospital should have kept

her there and delivered the baby and cared for it immediately upon delivery,

consistent with Plaintiff's wishes and Georgia law. Further the Hospital and

Defendant officers acted in intentional disregard of the clearly established law that

a mother cannot be charged with murder for prenatal activities.  Upon information

and belief, the defendant police officers prosecuted plaintiff for murder under

circumstances where no reasonable officer would have proceeded with the arrest

and prosecution without further investigation or research.

90.    Based on information provided in violation of HIPPA from Phoebe

Defendants, one or more Defendants whose names are not known, under the

supervision of the Chief of Police Michael J. Persley, sued individually and in his

official capacity, and one or more John Doe Supervisors, a decision was made to

arrest the plaintiff for malice murder after talking to and conspiring with one or

more agents of Defendant Phoebe Hospital including Yolanda Fields and including

the caseworker.

91.    At about 5pm police officers began to stand outside Plaintiff's hospital room

and unconditionally restrict her freedom of movement and prevent her from

leaving such that she was seized under the Fourth Amendment without first

hearing Plaintiff's side of the story or talking to other officials to receive the full

story about what had happened during Plaintiff's first visit to the Hospital.

92.     On June 6th 2015 the Defendant Chief Persley, and one or more John Doe

supervisors, Chanita Salyer and/or Lakesha Bryant, made a decision to arrest and

prosecute plaintiff for malice murder while acting individually and or jointly with

agents of Defendant Phoebe Putney Hospital and its agents including Yolanda

Fields, Dr. Reed, and Defendant Nurse Bell

93.     A black male DFACS worker who was heavy set, came into Plaintiff's room

and began asking questions about the whereabouts of her two children as if she

were about to be arrested.  Plaintiff informed him that her son Qadan was with his

grandmother and her son Kylan was with his natural father.  Caseworker also

accused her of trying to induce labor with the intention of killing the child.  By

inference the caseworker could have only reached this conclusion by discussion

with Yolanda Fields and other agents of Defendant Phoebe Hospital who may have

included Defendant Reed and Defendant Bell or information from them, or

information that was protected by HIPPA.

94.     A black female, who was a City of Albany police investigator, came into the

room shortly after eight and told the Plaintiff they were going to take her down to

the station and ask her some questions and that she should get dressed.  The

investigator was in a uniform, dark skinned but brown, about five foot six inches

tall, in her mid-thirties, and did not wear glasses. The investigator was accompanied by a male officer, about five foot six to eight inches, and mid-thirties.

95.    Plaintiff had just delivered a child and was still bleeding.

96.    Phoebe Putney Hospital made no arrangements to ensure that Plaintiff would get appropriate medical care under the treatment of the officers.

97.    The female officer directed Plaintiff to get out of bed and get dressed, which she did.

98.    As soon as Plaintiff walked out of the room, the male officer handcuffed her.

99.    The male and female officers escorted her to a car, placed her inside, and the male officer drove her to the jail or police department.

100.    On the way to the jail, at 1302 Evelyn Ave. Albany, Plaintiff's bleeding continued.

101.    At about nine at night, still June 6, Plaintiff was placed in an interrogation room. Plaintiff was not read her Miranda rights, prior to the custodial interview that ensued. The first person to interview her was a dark skinned black woman with glasses, about 210 to 220 pounds in her mid-forties, who had hair that was shoulder length and was wearing civilian clothes including pants and low heels. Also present was an officer, a black male, about six feet tall, large and about 250 pounds, very short hair, had his badge on a necklace, and was wearing cargo shorts. The interview was taped. Throughout the interview, Plaintiff denied that

she intended to harm the baby and the officers were trying to get her to admit that she intended to harm the baby. The first interview lasted about 40 to 50 minutes.

102.   During this first interview, a white nurse came into the interview room and took Plaintiff's blood and Plaintiff was told it was to see if she had any street drugs in her system. Plaintiff was not given a consent form and not advised of her right to seek an independent test.  Plaintiff did not consent to having her blood drawn.  It was feasible and there was amble time for them to get a warrant from a court to do this, and there was no emergency circumstances necessitating drawing the blood before securing a warrant from a judge or other judicial officer.

103.   At about 10 pm that night she was taken to another interview room for a second taped interview.  This time the woman officer from the first interview was not the active questioner and appeared to be the witness.  The active interviewer seemed like a supervisor who was a male six foot one, 270 pounds and plaintiff believes his first name was Anthony.  He interviewed her and told her that he was interviewing her and charging her with murder, and demanding her story.  This interview lasted about forty minutes. Plaintiff requested to use the restroom but was denied.  The active interviewer then verbally abused her, despite knowing her weakened physical and emotional condition, and said something to the effect that you can't complain about using the restroom when you've been charged with murder.

104.   During both interviews Plaintiff was still bleeding, was in a weakened condition, and the officers denied her requests for pads deal with the bleeding, and continued the interviews despite her weakened condition and continued bleeding. During one of the interviews Plaintiff bled onto her chair and showed the interviewers the blood.

105.   At about eleven pm, Plaintiff was booked, and then placed in a cell with a woman charged with murder.

106.   Right before Plaintiff was placed in the cell she was strip searched.

107.   Despite knowing Plaintiff's weakened condition an officer assigned Plaintiff to the top bunk.  Plaintiff requested to stay in the infirmary but was denied. Plaintiff also asked for pads as she continued to bleed but was denied, before she was placed in the cell.

108.   About three to four hours later someone brought plaintiff four pads and she went through two each hour.  After that she was without sufficient pads again, and then pads were brought again.

109.   On June 7th Defendant Chanita Salyer, an Albany Police Department investigator swore out a warrant on Plaintiff for malice murder.

110.   Throughout the day of June 7th Plaintiff was in severe back pain, had pain in the vaginal area, and was still bleeding heavily, and she requested medical help or to see the nurse, but she was not provided any medical help.

111.   The continued denial of medical care and harsh physical and emotional treatment was a practice, carried out over multiple days by multiple jailers and medical personnel, was intended to punish plaintiff in connection with the murder charge and was not reasonably related to any legitimate goal of pretrial detention.

112.   On June 8th Plaintiff again asked to see the nurse and was finally allowed to see the nurse, a black female with large features who was in her sixties, when Plaintiff asked about receiving something for pain and being moved to the infirmary.  This Defendant Jane Doe Nurse gave Plaintiff inadequate medication for pain, only providing Tylenol pm.

113.   On June 9th because of the prosecution Plaintiff attended a bond hearing for her charges.

114.   On June 9th or 10th, after Plaintiff's bond hearing, she was released from jail.

115.   On June 10th the murder charge was dismissed, nolle prosequi.

116.   Plaintiff suffered mental anguish because of the false murder charge.

117.   Medical expenses to date are in excess of $30,000 and attorney fees for defense of criminal charges in excess of $12,500.

## Count I: EMTALA

118.   Plaintiff incorporates above paragraphs 16-117.

119.   Plaintiff Kenlissia Jones on behalf of herself, Plaintiff Kenlissia Jones as next of kin of Baby Boy Jones, and Plaintiff Kenlissia Jones as administrator of the

estate of Baby Boy Jones, brings an EMTALA claim against Defendant Phoebe Putney Hospital.

120.   Phoebe Putney Hospital's initial discharge of Kenlissia Jones and her unborn child without providing treatment that was available violated EMTALA because Phoebe Putney Hospital had actual knowledge that Plaintiff was pregnant and having contractions and was in need of immediate medical attention due to the pain and suffering and risk to her health caused by the misoprostol pills and that Plaintiff's unborn child could not be safely transferred without posing a threat to its health. This EMTALA violation caused the death of Baby Boy Jones.

121.   Phoebe Putney Hospital's treatment of Baby Boy Jones after his delivery violated EMTALA because the Hospital delayed and/or refused to provide available medical aid to him despite knowing of his condition. Plaintiff as next of kin and as administrator of the estate can recover.

Count II: Medical Malpractice

122.   Plaintiff incorporates above paragraphs 16-117.

123.   Plaintiff Kenlissia Jones on her own behalf brings a medical malpractice claim against Phoebe Putney Hospital, Dr. Reed and Nurse Bell, for medical malpractice when discharging her from the hospital around 4:00 am on June 6th without treating her, causing unnecessary pain and suffering.

28

124.   The acts of these defendants involved willful misconduct, malice, wantonness, and conscious indifference, so plaintiff specifically prays for punitive damages pursuant to O.C.G.A. § 51-12-5.1

Count III: Medical Malpractice/Wrongful Death

125.   Plaintiff incorporates above paragraphs 16-117.

126.   Plaintiff as next of kin of Baby Boy Jones brings a wrongful death claim against Phoebe Putney Hospital, Dr. Reed and Nurse Bell due to the lack of treatment provided to her on June 6th including the initial discharge and her return. The initial discharge, without keeping her and her unborn child there such that medical aid would be provided to Baby Boy Jones as soon as possible, proximately caused, along with other wrongful acts or refusals to act by Defendants, the death of Baby Boy Jones who otherwise would have lived.

127.   The acts of these defendants involved willful misconduct, malice, wantonness, and conscious indifference, so plaintiff specifically prays for punitive damages pursuant to O.C.G.A. § 51-12-5.1

Count IV: Medical Negligence Per Se and Wrongful Death

128.   Plaintiff incorporates above paragraphs 16-117.

129.   Plaintiff Kenlissia Jones as next of kin of Baby Boy Jones brings a medical negligence per se claim against Defendants Putney Hospital, Dr. Reed and Nurse Bell, they breached their duty under O. C.G.A. § 16-12-141 (c)(2) to care for

Plaintiff's baby, proximately causing the death of Baby Boy Jones who otherwise would have lived. "If the child is capable of sustained life, medical aid then available must be rendered." O. C.G.A. § 16-12-141 (c)(2).

130.   The acts of these defendants involved willful misconduct, malice, wantonness, and conscious indifference, so plaintiff specifically prays for punitive damages pursuant to O.C.G.A. § 51-12-5.1

Count V: Fourth Amendment False Arrest

131.   Plaintiff incorporates above paragraphs 16-117.

132.   Plaintiff Kenlissia Jones brings a Fourth Amendment claim against Chief Michael J. Persely in his individual and official capacity, Chanita Salyer, Lakesha Bryant, John and/or Jane Doe supervisor(s) whose names and number are unknown and who authorized the malice murder charge on June 6, Phoebe Putney Hospital, Yolanda Fields, Dr. James Reed, and Nurse Bell, for false arrest for murder without probable cause, given her intent and effort to preserve and quicken the life of her unborn child and baby by a timely request for medical help and given the clearly established law that no murder charge could be brought in connection with her prenatal activities.

133.   Due to informational asymmetry and Defendants' control of the relevant information, Plaintiff does not know whether Defendants were informed of an alternative basis for arrest concerning Plaintiff's possession of misoprostol.

Count VI: Fourth Amendment Malicious Prosecution

134.   Plaintiff incorporates above paragraphs 16-117.

135.   Plaintiff Kenlissia Jones brings a Fourth Amendment Malicious Prosecution

claim against Plaintiff Kenlissia Jones brings a state-law malicious prosecution

claim against Chief Michael J. Persely in his individual and official capacity,

Chanita Salyer, Lakesha Bryant, John and/or Jane Doe supervisor(s) whose names

and number are unknown and who authorized the malice murder charge on June 6,

Phoebe Putney Hospital, Yolanda Fields, Dr. James Reed, and Nurse Bell,

individually and jointly in conspiracy with one another, for seizing her in violation

of the Fourth Amendment and causing her prosecution for malice murder without

probable cause and with malice, given her intent and effort to preserve and quicken

the life of her unborn child and baby by a timely request for medical help and

given the clearly established law that no murder charge could be brought in

connection with her prenatal activities.

Count VII: Fourth and Fourteenth Amendment Seizing Blood

136.   Plaintiff incorporates above paragraphs 16-117.

137.   Plaintiff Kenlissia Jones brings a Fourth and Fourteenth Amendment claim

against a Jane Doe white nurse whose name is unkownn, Chief Michael J. Persely

in his individual and official capacity, Chanita Salyer, Lakesha Bryant, and John

and/or Jane Doe supervisor(s) for the objectively unreasonable drawing of Plaintiff's blood where no exception to the warrant requirement applied.

### Count VIII: State Law Wrongful Detention Claim

138.   Plaintiff incorporates above paragraphs 16-117.

139.   Plaintiff Kenlissia Jones brings a wrongful detention claim against Chief Michael J. Persely, Chanita Salver, Lakesha Bryant, John and/or Jane Doe supervisor(s) whose names and number are unknown and who authorized the malice murder charge on June 6, Phoebe Putney Hospital, Yolanda Fields, Dr. James Reed, and Nurse Bell, individually and jointly in conspiracy with one another for wrongfully arresting her for murder without judicial process.

### Count IX: State Law Malicious Prosecution Claim

140.   Plaintiff incorporates above paragraphs 16-117.

141.   Plaintiff Kenlissia Jones brings a state-law malicious prosecution claim against Chief Michael J. Persely, Chanita Salyer, Lakesha Bryant, John and/or Jane Doe supervisor(s) whose names and number are unknown and who authorized the malice murder charge on June 6, Phoebe Putney Hospital, Yolanda Fields, Dr. James Reed, and Nurse Bell, individually and jointly in conspiracy with one another for causing her prosecution for malice murder without probable cause and with malice.

W H E R E F O R E, Plaintiff prays judgment against one or more Defendants, individually or jointly for the following:

a.      Compensatory damages as allowed by law;

b.      Special damages, as more particularly shown at trial;

d.      Damages for injuries caused by deprivation of Constitutional rights under

the United States Constitution;

e.      Punitive damages against each Defendant individually;

f.      Reasonable attorney fees, costs and expenses of litigation under 42 U.S.C. §

1988 and for award of fees under state law for bad faith in the underlying facts;

Any other and further relief so ordered.

A JURY TRIAL IS HEREBY REQUESTED.

Respectfully submitted this the 6th day of June, 2017.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
Attorney for Plaintiff Jones


Prepared by:

John P. Batson
P. O. Box 3248
Augusta, GA 30914
Phone: 706-737-4040
FAX: 706-736-3391
Email: jpbatson@aol.com